### WHEAT v. FORD MOTOR CO.

### No. 11720.

Circuit Court of Appeals, Eighth Circuit.

April 9, 1941.

Martin J. O'Donnell, of Kansas City, Mo. (Everett R. Meyer and Whitson Rogers, both of Kansas City, Mo., on the brief), for appellant.

Frank Parker Davis, of Chicago, Ill. (Madden, Freeman & Madden, of Kansas City, Mo., I. Joseph Farley and Thomas J. Hughes, both of Detroit, Mich., and Alfred Kuraner, of Kansas City, Mo., on the brief), for appellee.

Before GARDNER, SANBORN, and THOMAS, Circuit Judges.

SANBORN, Circuit Judge.

William G. Wheat, as plaintiff, brought this action against the Ford Motor Company, claiming that its Ford V-8 automobiles, constructed during and since 1932, infringed United States Letters Patent No. 1,394,242 issued to him October 18, 1921, for an "underslung attachment for motor vehicles." The patent was applied for October 14, 1919. The defenses asserted were anticipation, lack of invention, and noninfringement. The court below determined that there was no infringement, and dismissed the complaint.

In 1919, hard surface roads were in their infancy, and deep ruts and high centers required that automobiles of that day have a high clearance. Automobile racing was done largely upon dirt tracks. Automobiles with a high clearance and a high center of gravity could not be driven with safety as fast as cars with a low clearance and low center of gravity. To convert the standard cars of that day into satisfactory racing cars required that the body and frame be lowered and the clearance and center of gravity reduced. Wheat, a young man with mechanical skill, who was interested in automobile racing and who worked on and around automobile race tracks in Missouri, devised a method of lowering the body of the Model T Ford automobile and converting it into a racing car.

Wheat's method of lowering the body and frame of the car was to disconnect

the front end of the chassis frame from the front suspension spring, which was mounted over the front axle; to shift the chassis frame rearward and to drop and fasten the front end of the frame upon a rearwardly extending arm of a substantially Z-shaped bracket, the upper or forwardly extending arm of which was mounted upon the front spring; to cut off the rearward ends of the chassis side rails, and to substitute therefor goose neck brackets with their upper ends extending rearwardly of the rear axle where they were attached to the rear cross member of the chassis frame, which was mounted upon the. rear spring, the ends of which were fastened upon "perches" (attached to the brake drum housings) behind the real axle, instead of on top of it. Conceiving that what he had done involved invention, Wheat applied for a patent. In his specification he stated: "This invention comprehends the provision of an underslung attachment for motor vehicles, and is primarily designed for Ford cars; the object being to lower the body of the car so that it will hold the ground or surface when traveling at a high speed, the invention being particularly useful for Ford racers and speedsters."

The claims which were first applied for were all rejected by the Patent Office in a letter from the Examiner which contained the following statements: "Applicant has made two changes in the usual Ford Chassis. He has extended the position of the front axle and that of the rear axle. It is old to extend the front axle as shown in Motor Age, Sept. 18, 1919, page 38, published in Chicago, Ill. A copy of this publication may be seen in Div. 10, Pat. Office. This of course necessitates a new radius rod, but this has been the subject matter of a number of patents. See Kundsen, 1,221,190, Apr. 3, 1917, and Weiss, 1,281,239, Oct. 8, 1918. It is old to extend the rear frame as shown by Hayes, 1,179,-829, Apr. 18, 1916. Placing the spring at the rear of the axle is also old as shown by Nelson, 1,005,284, Oct. 10, 1911, and by Crittenden, 1,046,273, Dec. 3, 1912, 180-85. In view of this state of the art all the claims are rejected."

Wheat acquiesced in the rejection of his original claims, and substituted five others. The letter of his attorney substituting new claims contained the following "remarks";

"It is respectfully submitted that the applicant is not claiming what the Examiner outlines in the last Official Letter the extension of the front and rear axles of a motor vehicle. The extension of these parts is what applicant accomplishes but is not broadly claimed. On the contrary, it is the particular construction of means utilized to carry the idea into effect, that constitutes the jist of the invention, and it is believed that the claims now offered are clearly allowable.

"The claims are specific to the particular formation of the bracket illustrated in Figure 5, and also set up the relative position of this bracket with regard to the adjacent end of the machine and its associated parts, and it is not seen that the references or reasons for rejection contained in the last Office Letter provides a legitimate anticipation of the claims now submitted. It is hoped that these claims will be carefully considered on their merits with a view of their allowance, and such action at an early date is respectfully solicited."

Three claims were finally allowed, as follows:

"1. An underslung attachment for motor vehicles comprising means for supporting the rear spring of the machine whereby the terminals thereof are secured at points rearwardly of the adjacent axle, a substantially Z-shaped bracket having one end secured to the machine and its opposite end arranged in advance of the latter, means for securing the front spring of the machine to the latter mentioned end of the bracket with the body of the bracket arranged between the spring and radiator, a radius rod terminally connected with the adjacent extremities of the front spring, and the body portion of the bracket having an opening beneath the spring for the purpose specified.

"2. An underslung attachment for motor vehicles comprising means for supporting the rear spring in a manner whereby the terminals thereof are secured at points rearwardly of the adjacent axle, a substantially Z-shaped bracket having one end secured to the machine and its opposite end disposed in advance thereof, means for suspending the front spring of the machine from the latter mentioned end of the bracket, a radius rod terminally connected with the adjacent ends of the spring, an arm depending from the forward end of the bracket in parallelism with the body thereof, and a brace rod connecting the said

arm and body and arranged transversely of the spring.

"3. An underslung attachment for motor vehicles comprising means for supporting the rear axle in a manner whereby the terminals thereof are secured at points rearwardly of the adjacent axle, a Z-shaped bracket having one end secured to the machine, and its opposite end arranged in advance thereof, means for suspending the front spring of the machine from the latter mentioned end, a substantially V-shaped radius rod having its terminals connected with the adjacent extremities of said spring, an arm depending from the forward end of the bracket, and said arm and body portion of the bracket having alined crank receiving openings."

It is to be noted that each of these claims is for "an underslung attachment for motor vehicles," and that each is for a combination of elements arranged in a specific way, for the purpose of lowering the body of an already constructed automobile.

It is apparent that, in view of the file wrapper history of this patent, its specifications, and the state of the prior art, only a narrow scope could be given to the claims of the patent, Schriber-Schroth Co. v. Cleveland Trust Co., et al., 311 U.S. 211, 217, 218, 61 S.Ct. 235, 85 L.Ed. ——, and that the patent could be accorded only a narrow range of equivalents. Freeman v. Altvater, 8 Cir., 66 F.2d 506, 510.

The 1932 Model V-8 Ford automobile was so constructed that it had less clearance and a lower center of gravity than any of its predecessors. The lowering of the body was accomplished through the use of a drop-center front axle, a flatter front spring, double-drop chassis side rails, and a rear spring suspended behind the rear axle. No brackets of any kind were used, and what the defendant did was not to adopt any "underslung attachment for motor vehicles," in order to produce a car having a lower center of gravity, but to resort to old and well-known mechanical expedients for securing that result. The contention of Wheat that the means employed were the mechanical equivalent of the combination disclosed by his patent, is without any merit. He misconceives the meaning of the word "equivalent" as used in the patent law. His interpretation of that word apparently is that all means, whether similar or dissimilar, whereby a desired result is accomplished are the equivalents of each other. It is only where an accused device is substantially identical with the one alleged to be infringed in the result attained, in the means of attaining that result, and in the manner in which the different parts operate and co-operate to produce the result, that the accused device is an equivalent which constitutes an infringement. Electric Protection Co. v. American Bank Protection Co., 8 Cir., 184 F. 916, 923; McDonough v. Johnson-Wentworth Co., 8 Cir., 30 F.2d 375, 383. There is no substantial resemblance between the means employed by Wheat to lower the body of an existing automobile and the means which were employed by the defendant in constructing the accused car with a lower center of gravity and a lower clearance. The several means which the defendant employed were not covered by the Wheat patent, either separately or in combination, nor could these means have been covered by it, since each was old in the art and each obviously made its separate contribution toward securing the desired result.

Since the accused device did not embody the claimed invention of the plaintiff, did not include elements essential to plaintiff's patented combination, and made use of mechanical expedients old in the art and available to everyone, there was no infringement by appellee of the Wheat patent, and the court below rightly dismissed the plaintiff's complaint upon that ground. Whether the decree could also be sustained on the ground that the Wheat patent, which has now expired, was invalid for lack of invention and constituted merely an aggregation of old elements, rather than a patentable combination, it is unnecessary to decide.

The decree appealed from is affirmed.